## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DONALD PARKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 8:08CV427 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | MEMORANDUM |
| the Social Security Administration, | ) | AND ORDER |
| | ) | |
| Defendant. | ) | |

Plaintiff, Donald Parks, seeks review of a decision by the Commissioner of the Social Security Administration (SSA), denying his applications for disability insurance benefits and supplemental security income benefits.

After carefully reviewing the administrative record and the parties' written arguments, the court concludes that the SSA decision should be affirmed.

## I.  PROCEDURAL BACKGROUND

Plaintiff, Donald Parks, seeks review of a decision by the Commissioner of the Social Security Administration (SSA), denying his applications for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq*.

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a final decision of the Commissioner of the Social Security Administration under Title II.  Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of final decisions of the Commissioner under Title XVI.

Plaintiff's claims were denied initially, and on reconsideration.  On May 3, 2007, following a hearing, an administrative law judge (ALJ) found plaintiff was not under a "disability" as defined in the Act.  On August 13, 2008, the Appeals Council denied plaintiff's request for review.  The decision of the ALJ stands as the final decision of the Commissioner.

## II.  FACTUAL BACKGROUND

The administrative record shows the following.

Plaintiff protectively filed applications for disability benefits (DIB) under Title II and for SSI under Title XVI on December 30, 2004.  Plaintiff, who was born in 1964, alleges he became disabled beginning July1,2001 (Tr. 89).  Plaintiff amended his alleged disability onset date[1] to June 1, 2002, at his administrative hearing.  He alleges disability due to bipolar affective disorder, depression, anxiety, panic, and back pain.

### A.  Medical Records

In August 2004, plaintiff had emergency surgical removal of his gallbladder (Tr. 230-47).  At that time, plaintiff did not have a primary care physician or take prescription medication, and the examination showed mild distress.  Plaintiff reported drinking about a 12 pack of beer on the weekends.

In late November 2004, plaintiff sought treatment for his mental condition at the Douglas County Community Mental Health Center, and was prescribed medication.  Mary Hanigan, M.D.,

---

[1]In order to meet the requirements for "insured status," which is required for Title II benefits, an individual must have 20 quarters of coverage in a 40-quarter period ending with the first quarter of disability. *See* 42 U.S.C. §§ 416(i)(3)(B), 423(c)(1)(B); 20 C.F.R. § 404.130 (2008).  Plaintiff's insured status expired on September 30, 2004 (Tr. 82, 319).  Accordingly, to receive Title II benefits, Plaintiff must show that he became disabled on or before September 30, 2004.

psychiatrically evaluated plaintiff and diagnosed bipolar affective disorder by history, dysthymia by history, alcohol abuse, and antisocial personal disorder traits (Tr. 201-206). The mental status examination showed dysphoric and irritable mood, constricted affect, anxiety, paranoia, and reflected that plaintiff was polite and somewhat solicitous (Tr. 202). Plaintiff was referred to a rehabilitation and recovery services program but did not follow through with that referral (Tr. 151, 182, 184, 196). A mental status examination on December 27, 2004, showed paranoia but that overall, plaintiff felt more calm and was compliant with treatment; he stated that he had an apartment in his parents' house (Tr. 188). Dr. Hanigan adjusted plaintiff's medications in December 2004 and February 2005.

- **March 8, 2005 Consultative Physical Examination**

Dr. Samuel E. Moessner physically examined the plaintiff on March 8, 2005. Dr. Moessner described plaintiff as "a healthy appearing, trim, but well developed white male in no acute distress." (Tr. 214). Plaintiff was moving about without pain behaviors. His grooming and hygiene were excellent, he completed questionnaires without much difficulty and remained attentive and cooperative.

The plaintiff advised Dr. Moessner that his chief complaint was his bipolar illness or depression. Plaintiff had secondary complaints of low back pain, a bad back and right shoulder, and a bad right hand. He told Dr. Moessner that he was injured in a motor vehicle accident in 1985, sustaining a fractured right pelvis and femur, together with lesser injuries. Plaintiff said he was able to return to a fairly normal life, but started having aches and pains in his right lower leg and up into the hip and lower back and buttock region. The pains were related to activity level and progressed over the years "until recently." Plaintiff reported that he had gradually developed backache from

-3-

chronic wear and tear on the lower spine, but did not recall a specific injury to the spine.  His activities were limited by pain in the right lower back, buttock region and right hip.  To a lesser extent, he had problems with his right shoulder and arm if he tried to carry heavy loads or use heavy tools.

Plaintiff did bathe, feed and dress himself and could lift 10 to 20 pounds.  He could sit comfortably for 15 minutes or more and stand for about 30 minutes.  He could walk several blocks but felt discomfort after about two blocks.  Plaintiff could lie down indefinitely.  His activities were limited only by pain, not fatigue, dizziness or weakness.  Plaintiff reported difficulties with stooping, climbing stairs, kneeling, crawling, squatting, bending and twisting.  He could climb several flights of stairs if necessary without too much difficulty.  He had no particular problems using his hands; however, he developed some arthritis in the right hand from a fracture which occurred in 1989 in a mishap with a wheelbarrow.

Plaintiff stated that his pain and achiness was relieved by rest or medication.  He did not use heat or ice treatments; he had tried heat treatment with no improvement.  He had not received any injection or physical therapy treatments.

Plaintiff told Dr. Moessner that he had been in Omaha for about one year and was working until late 2004 doing some remodeling work.  He could not keep up with the work because of the pain in his back and buttock region and felt that he needed to get out of that line of work and find other vocation.  He said he was having some difficulties thinking clearly, which may have impacted his work performance.  He did, however, have recent improvement in his mental health with adjustments to his medication.

-4-

Plaintiff told Dr. Moessner that he got along fairly well until the past year when he developed a lot of abdominal pain. His gallbladder apparently ruptured, and he had a cholecystectomy for gallstones.

Immediately prior to the March 8, 2005 physical examination, plaintiff had been going to the Douglas County Hospital for his health care needs. In 1995, he was hospitalized for two weeks at the Douglas County Hospital after a suicide attempt.

Plaintiff graduated from Omaha South High School in 1983. He lived in Kentucky for about eight years. He has never married and has not fathered any children. He had some technical schooling in Kentucky for appliance repair work but did not finish the program because he became bored with it. "He now blames this on his bipolar illness." (Tr. 211). He allowed his driver's license to lapse, does not have his own car, and came to his doctor's appointment by bus. Plaintiff has been living with his parents since he moved back to Omaha from Kentucky. Plaintiff stated that he helps around the house with laundry, cleaning, cooking, mowing and shoveling snow; however, he hurt his back in the yard within the last few months and now tries to avoid yard work.

As of the March 8, 2005 examination, plaintiff reported drinking a little beer on weekends, but not on a daily or regular basis. He said he tried to cut back because of his bipolar illness. He admitted he used to drink a little excessively on weekends, but no longer does so. Plaintiff did not consider himself an alcoholic and had not used any street drugs in recent years. He said he had no legal problems other than a violation in 1991 for driving under the influence.

Plaintiff told Dr. Moessner that he usually slept fairly well, occasionally took a nap during the day, and had a good appetite.

-5-

Dr. Moessner concluded that plaintiff had a history of bipolar illness, allegedly chronic and treated; probable early osteoarthritis of the right shoulder, right upper extremity and lower extremity, related to past injuries; degenerative disk disease of the lumbar spine, mild, and of several years duration; a history of tobacco abuse, 25 pack years by history; status post open reduction and internal fixation of the right femoral fracture in 1985 with good results; and status post cholecystectomy in 2004. Plaintiff seemed like "a fairly intelligent and currently fairly stable individual," who had reported some major mood swings and behavior problems related to bipolar illness. Plaintiff said he had trouble staying focused and was uncertain as to whether he would try to pursue some other trade or skill.

- **March 8, 2005 Psychological Examination**

A psychological interview was also conducted March 8, 2005 by A. James Fix, Ph.D., to help in the determination of plaintiff's disability status. Plaintiff told Dr. Fix he was disabled by his back and hip, and then "bipolar," a condition that was diagnosed when he was 30. Plaintiff did not report any periods of euphoria or elevated moods and said he can think clearly when he feels good. He stated that his moods often shift very suddenly downward and described his depression as experiencing overwhelming sadness. Plaintiff told Dr. Fix he had to admit that, with the medication, he was doing a lot better.

Dr. Fix generally observed plaintiff to be loud and talkative, and very dogmatic, expressing a great deal of anger about things in general. Although plaintiff claimed that he disliked almost everybody and had conflicts with other people continuously, he showed no irritability towards Dr. Fix directly (Tr. 220). He was alert and responsive, was cooperative, and showed no pain-related

-6-

movements.  He said that he was "very depressed" on the day of the examination, but denied suicidal

ideation.  Dr. Fix observed that plaintiff seemed to express and experience his depressions through

irritability and ruminative anger; however, he seemed remarkably calm, with a low level of anxiety.

(Tr. 223).  He did not become tearful, but talked negatively about himself on several occasions and

seemed to show depression by very negative self-appraisal.  Speaking negatively about things in

general seemed to be relaxing to him rather than straining; it seemed to take some of the agitation

away but also kept the hopelessness and depression stirred up.  (Tr. 224).

Dr. Fix reported that the plaintiff was well oriented in all spheres.  He had strongly average

abilities, possibly above average, which contrasted strongly with his low-level work in high school

and the lack of much career growth during his working years.  "This would imply a habitual form

of adjustment, performing well below his abilities."  (Tr. 224).

Plaintiff stated that he graduated from South Omaha High School with poor grades, and he

had to attend summer school to obtain a diploma.  He was not involved in any activities, received

at least 40 suspensions and was expelled once for the reason that "[p]eople piss me off."  (Tr. 222).

He has never been married and said he had no children; his relationships did not seem to last.  In the

1990s, he was convicted four times for driving under the influence.

Plaintiff's previous jobs included working in restaurants, tree removal, warehouse work,

appliance repair, and remodeling.  He said he quit because he could not take the physical labor any

more.

Plaintiff told Dr. Fix he has had several broken bones; his jaw was broken in a fight.

Apparently, his physician was Dr. Hanigan but he did attend the county hospital clinic.  Plaintiff

-7-

received no counseling and, apparently, none had been recommended.   On the date of the examination, plaintiff was taking medications (Prozac, Abilify, and a third medication he could not remember) to calm him down.   He quit taking a previous course of similar medications because he did not think he needed them.

Plaintiff reported that he smokes 20 cigarettes a day and drinks a couple beers on the weekend, though he "slacked off" when told not to drink while taking the medications.   At the age of 28, he went through a 30-day inpatient treatment program at St. Gabriel's that got him off hard liquor.   He has not been convicted of DUI since that time; however, plaintiff went back to drinking beer heavily, "cutting back because he was taking medications, but still drinking alcohol, something that is almost universally disapproved of in treatment programs."   (Tr. 223).

Plaintiff stated that he typically gets up at 8 a.m., drinks coffee and watches TV.   He takes a walk and visits a friend and then goes back to bed for a couple of hours.   He wakes and watches television.   He told Dr. Fix, "Between my pain and my dislike of people in general, I can't do much." He lives in his parents' house, in his own apartment there.   He prepares his own meals.   He watches television or visits friends in the evening.   He retires at 9:30 p.m. and described his sleep as "restless, but if I take my meds, I sleep pretty good."

Dr. Fix identified three aspects of plaintiff's condition that provoked concern:  (1) with mood disorder, there is always a possibility that even the occasional use of alcohol can impair the functioning; (2) Dr. Fix did not know whether plaintiff's described low level of alcohol was his actual amount or whether there was more; and (3) Dr. Fix had trouble knowing why plaintiff was not

-8-

engaging in any counseling of any kind.    "Certainly, anger management would be strongly

recommended." (Tr. 225).  His diagnosis was:

| | | |
|---|---|---|
| AXIS I | Major depression, chronic.<br>Rule out bipolar disorder.<br>Alcohol dependence. | |
| AXIS II | Antisocial personality disorder. | |
| AXIS III | Back and hip pain, reported.<br>History of several broken bones, including a broken jaw, reported. | |
| AXIS IV | Severe with medical and financial concerns. | |
| AXIS V | Current 45, highest 55. | |

(Tr. 225).  Dr. Fix concluded:

> The claimant's disorder has been life long and it seems to me like it is mostly an
> Axis-II condition aggravated by chemical use and by ongoing social conflicts.
>
> In terms of the supplemental questions that accompanied the claimant's referral, the
> claimant does restrict his activities of daily living.  He withdraws a good deal.  He
> has few plans or goals.  He openly dislikes most people and has had numerous
> conflicts with them.  The claimant does have mood changes with significant
> depression and withdrawal.  Today the claimant showed good concentration and
> attention.  He was able to understand and remembered instructions.  If he does not
> have much contact with other people, he can probably work under ordinary
> supervision.  However, close interpersonal contact would probably cause conflicts
> and disturbance of his performance.  There is little ability to relate appropriately to
> other people at this time.  The claimant expresses considerable irritability and seems
> comfortable with the irritability.  The claimant is able to adapt to changes in his
> environment.

(Tr. 225-226).  Dr. Fix finally noted that the plaintiff continued to use alcohol, has been treated on

an inpatient basis for alcohol dependence, and probably would not be allowed to handle his own

finances.

-9-

• **Physical Residual Functional Capacity (RFC) Assessment (March 14, 2005)**

In a report dated March 14, 2005 (Tr. 155-162 & 221), a Disability Determination Services (DDS) physician concluded that the plaintiff could occasionally lift 20 pounds; could frequently lift 10 pounds; could stand and/or walk  for about 6 hours in an 8-hour workday; could sit for about 6 hours in an 8-hour workday; plaintiff was otherwise unlimited in the ability to push and/or pull; and plaintiff was occasionally limited in climbing, balancing, stooping, kneeling, crouching and crawling.  No manipulative, visual, communicative, or environmental limitations were established.  The symptoms alleged by the plaintiff to produce physical limitations were attributable to a medically determinable impairment (MDI); however, the severity or duration of the symptoms was disproportionate to the expected severity or expected duration on the basis of the plaintiff's medically determinable impairments.  The doctor commented:

> The claimant's allegations are partially credible.  While he does have severe MDI [medically determinable impairments] as noted, they do not meet/equal listing level.  His allegations of pain and inability to walk and stand appear to be excessive considering the physical findings.  Despite his allegations of pain, he has only recently been involved in medical treatment.  He did report that he was doing remodeling work up until late 2004....

(Tr. 221).  On May 20, 2005, the medical consultant affirmed as written the March 14, 2005 RFC Assessment.

• **Psychiatric Review Technique & Mental Residual Functional Capacity (RFC) Assessment (March 14, 2005)**

The Psychiatric Review Technique completed by a DDS physician, based on plaintiff's medical records and RFC assessments, concludes that plaintiff had the medically determinable impairments of chronic major depression (Tr. 166); antisocial personality disorder (Tr. 170); and a

-10-

substance addiction disorder (Tr. 171).  The document reflects that plaintiff was mildly limited in the activities of daily living, moderately limited in maintaining social functioning, and not limited in maintaining concentration, persistence or pace.  There was no functional limitation based on "Repeated Episodes of Decompensation, Each of Extended Duration."  (Tr. 173).

The corresponding Mental RFC Assessment (Tr. 177-181) reflects that plaintiff was moderately limited in the following activities:

> The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances,
>
> The ability to work in coordination with or proximity to others without being distracted by them,
>
> The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods,
>
> The ability to accept instructions and respond appropriately to criticism from supervisors, and
>
> The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

The plaintiff was markedly limited in the ability to interact appropriately with the general public.

(Tr. 173).  He was not significantly limited in any other respect.  The doctor concluded:

> His allegations do appear partially credible.  He does have mental problems as alleged, however, it appears that his primary condition is a longstanding personality disorder.  His condition is aggravated by his use of alcohol.  He does limited his ADL [activities of daily living], but it appears he is capable of doing his own daily activities without assistance.  While there is an absence of evidence prior to the DLI [date last insured], his current diagnosis and history are consistent with a longstanding condition.  He does have significant limitations in areas involving interpersonal relationships.  However, he is capable of performing work activity with moderate limitations.  He does have marked limitations in dealing with the general public.  DAA [drug/alcohol abuse] is not material.

(Tr. 181).  These conclusions were reaffirmed on May 15, 2005.  (Tr. 182).

• **Subsequent Medical Records**

Plaintiff returned to Dr. Hanigan in June 2005 because he had run out of medication.  He reported that he was unable to keep appointments or follow-up with a therapist because of a lack of motivation (Tr. 257-260).  The mental status examination showed good eye contact, good grooming, cooperative behavior, dysthymic mood, appropriate and normal affect, suicidal ideation without intent to complete, and goal-directed speech (Tr. 257).  Plaintiff was encouraged to attend therapist sessions and anger management classes, and his medications were changed (Tr. 257).

In August 2005, Dr. Hanigan recorded that plaintiff was less depressed but still irritable (Tr. 255-256).  Plaintiff reported the medication for panic attacks was working well.  He said he had attempted to attend the rehabilitation services program four to five months prior, but was not accepted because he was "too angry."  He reported that he drank two beers a week and smoked one pack of cigarettes per day.

Plaintiff missed an appointment he had scheduled for January 13, 2006.  He had not been seen at the Douglas County Community Mental Health Center since August 2005.  On January 23, 2006, he then presented for care at his doctor's walk-in clinic (Tr. 256).  Plaintiff had not taken medications for one month  and said he could not remember whether they were helpful or not (Tr. 256).  The mental status examination showed flat, blunted affect and irritable mood (Tr. 256). A nurse reviewed the importance of medication compliance, and medications were prescribed (Tr. 254, 256).

Plaintiff attended appointments with Dr. Hanigan on January 31, 2006 and February 14, 2006 (Tr. 253, 254). On January 31, 2006, plaintiff reported being extremely depressed and said he had been off of his medications for the past three months. He "has consistently not been showing up for his appointments b/c he received a bill for 800.00 & he figured he couldn't afford it." (Tr. 253). The mental status examination showed appropriate eye contact, polite and cooperative behavior, full affect congruent with mood, and that plaintiff appeared stable (Tr. 253).

A February 23, 2006 mental status examination showed euthymic mood and stable affect, linear and goal-directed thoughts, and good eye contact and grooming (Tr. 252).

Plaintiff was not seen again at the Douglas County Community Health Center until June 30, 2006, at which time he "claims he is just running out of meds." (Tr. 250). He came to the walk-in clinic on July 3, 2006 because he "forgot to come in" for his scheduled appointment. He said he had been off his medications for a couple weeks and had feelings of anger, agitation, hostility and suicide. The nurse discussed with him the importance of med compliance. He asked for Viagra and said he just lays in bed all day. He asked about federal financial aid administration papers. The nurse advised him to see his primary care physician about the Viagra. Plaintiff was told to follow up with the nurse in three weeks and to be sure to attend his August 14 M.D. appointment. Plaintiff said he understood. (Tr. 250). At this time, he was issued a prescription for a three-week supply of five medications, with one three-week refill.

On October 4, 2006, plaintiff called to request another appointment. Apparently, he had not been seen by Dr. Hanigan since February and denied seeing another doctor between February and

-13-

October 2006.  (Tr. 299).  Plaintiff appeared at his October 30, 2006 appointment wanting to restart his meds.   He thought he could get by without his medication, but said he felt much better on them. He complained of racing thoughts and said he spent most of his days sleeping.  He stated that he had been sober since March 2006.  The Mental status examination showed flat affect, dysphoric mood, and cooperative behavior (Tr. 299).

On November 21, 2006, Dr. Hanigan recorded that plaintiff was doing better.   The examination showed plaintiff was less irritable and had an engaging affect.  (Tr. 298).

On February 6, 2007, plaintiff reported increased symptoms, but admitted he had been off his medications for more than a week. (Tr. 296-98).

On March 15, 2007, plaintiff came to the walk-in clinic because he had missed scheduled appointments with Dr. Hanigan.  The mental status examination showed he was irritable, anxious, and angry at everything.  He was alert and oriented, denied drug and alcohol use, and said he was compliant with his medications.   (Tr. 295).

On March 26, 2007, plaintiff reported having a good day.  He said he had been compliant with his medications and had completely stopped alcohol.  He said he had thought of hanging himself, but his religious beliefs kept him from acting on these thoughts.  The examination showed a depressed mood with constricted affect, and plaintiff's medications were increased.  (Tr. 294-95).

Plaintiff returned to Dr. Hanigan on May 21, 2007, expressing frustration with the denial of his applications for Social Security benefits.  He told the doctor he could not get to appointments due to lack of transportation.  His sleep had improved, and he blamed others for problems.  (Tr. 292).

-14-

On July 16, 2007, plaintiff reported that he was tired.  He appeared to be irritable and pessimistic.  His sleep was OK and he was sober.  He had not followed through with bus tickets.  He saw Dr. Hanigan again in July 2007, when the doctor increased his medications.  (Tr. 292). Dr. Hanigan changed plaintiff's medications in September 2007, and continued the medications at appointments in November 2007, February 2008, and May 2008 (Tr. 289-291).

**B.  Administrative Hearing, October 17, 2006**

Plaintiff's applications for benefits were denied initially on March 15, 2005, and upon reconsideration on May 20, 2005, and plaintiff requested a hearing before an Administrative Law Judge (ALJ).  At the start of the hearing, the ALJ noted the references in the record to plaintiff's alleged bipolar disorder, hip problems, degenerative disk disease, degenerative joint disease of the lumbar spine, major depressive disorder, antisocial personality disorder, osteoarthritis, panic attacks, alcohol abuse, pancreatitis (asymptomatic as of August 2004), and hyperlipidemia.

Plaintiff testified that he has not worked since June 1, 2002.  He was involved in an automobile accident on July 19, 1985.  He had "broken tailbones" and re-fractured his hip in 1999 when he was living in Kentucky.

Plaintiff testified he began seeing Dr. Hanigan in about 2004 and sees her one hour every few months.  Although he had some emotional issues, he saw his problem primarily as a physical problem.  He stated that he had depression, anger issues, and big fluctuations in mood with millions of thoughts going on at one time.  Plaintiff told the ALJ that he was able to graduate from South High School only because the school had too many students and let him slip through the crack.  His depression has "been around for 20 some years." (Tr. 326).  He acknowledged that the medications

-15-

prescribed by Dr. Hanigan were helpful in slowing down the racing thoughts and anxiety.  The major side effects of the medications were drowsiness in the morning and that his "sex life is zero."  (Tr. 337).

Plaintiff testified he had not sought a therapist or someone to see more frequently because he could not afford it.  Dr. Hanigan had referred plaintiff to Dr. Gillespie.[2]  Plaintiff met with Dr. Gillespie one time but did not like him; Dr. Gillespie "pissed [him] off," and plaintiff did not want to deal with him.  Apparently, plaintiff objected to being seen by Dr. Gillespie's students (Tr. 333). He refused to see Dr. Gillespie again.

Plaintiff did not think he had a drinking problem.  He testified he would drink a 12-pack or a case with his friends on the weekends.  He disagreed with the diagnoses made in 2005 reflecting that he had a problem with alcohol dependence.

Plaintiff told the ALJ that he did not have a treating physician because he could not afford one, and Douglas County would not take him in because he was not on General Assistance.  He was not on General Assistance because they wanted him to work at Good Will; when he went to Good Will, he turned around and went home, back to bed, because he got paranoid.  The Community Alliance Program originally would not let him in because he had problems controlling his anger. They let him in after he demonstrated he had a little bit of his anger under control.  He went there a couple of times, got paranoid, and walked out.

Explaining the nature of his paranoia and anger, plaintiff testified that he had a hard time dealing with strangers.  He thinks the strangers are looking at him and talking about him, and he gets

---

[2]A medical record dated August 2, 2005 (Tr. 255) indicates that plaintiff was willing to see Dr. Gillespie if Dr. Hanigan's office made the appointment.

-16-

angry.  Plaintiff made derogatory remarks about his brothers, who also made him angry.  He testified

he used to be physically violent, but now isolated himself by staying in bed most of the time.  He

described himself as "antisocial."  (Tr. 334).  His family members make him feel "inferior."

Turning to the topic of a $1,600 medical bill he received from Douglas County, plaintiff

stated that he missed a few appointments because he could not afford the bills.  Dr. Hanigan advised

him to reapply for General Assistance, but that plan fell through because he did not comply with

their wanting him to work at Good Will.

At the time of the October 2006 hearing, plaintiff attributed his difficulty in keeping his

appointments at Douglas County to getting billed.  He also had a "lack of motivation" because he

would have to take the bus and be around other people.  The effort was "just not worth it," so he

would turn around and go back to bed.  He estimated that he spent 75% of each day in his room or

lying in bed.  (Tr. 337).

Plaintiff testified he had extended periods of sobriety from February 2005 through June 2005

and from February 2006 to the time of the October 17, 2006 administrative hearing.  (Tr. 330-331).

He testified that he could only stand for about an hour in an eight-hour day, could only walk for

about 20 minutes, and could only sit for an hour total due to the pain in his hip.  He had not sought

medical treatment because of the cost.

Plaintiff's friend, Diane Beckwith, testified as to plaintiff's difficulty getting along in groups

of people.  He seemed to have a problem with anger.  She has never seen him drink alcohol.

Dr. Thomas England testified as a medical expert. He reviewed the records of the case, including the medical records submitted to the ALJ on the day of the hearing. There were no medical records prior to November 23, 2004, when plaintiff first contacted Douglas County.

He noted that Dr. Fix reported that plaintiff was still drinking in March 2005, contradicting plaintiff's testimony that he had a period of sobriety from February 2005 through June 2005. Plaintiff countered that he might have been off by two months and had not been drinking since the beginning of 2006. (Tr. 349).

Dr. England noted that there were no medical records predating November 23, 2004; therefore, there was not sufficient evidence to establish any medically determinable impairment before that date. After November 23, 2004, the record reflected diagnoses under three categories:

• **Listing 12.04, Affective Disorders.** The doctors' diagnoses were somewhat variable. Dr. Fix diagnosed major depressive disorder, chronic. Dr. Hanigan's reports reflect diagnoses of bipolar affective disorder and dysthymia. The record also reflected symptoms of sleep disturbances, decreased energy, difficulties concentrating and thinking. Dr. England thought a diagnosis under 12.04 was well established, but it was not entirely clear whether it was a major depressive condition or a bipolar affective condition. Dysthymic disorder is a milder form of depression that tends to be more responsive to medication than some other depressive conditions; however, it may last longer than a bipolar depressive state or an episode of recurrent major depression. Dr. England did not find any formal medical diagnosis of anxiety or panic attacks and there was no clear evidence of a separate anxiety condition.

-18-

- **Listing 12.08, Personality Disorders.** Dr. Hanigan and Dr. Fix both diagnosed antisocial personality disorder, based on plaintiff's anger and aggressiveness. Depression could lead to irritability, angry outbursts and anxiety. It appeared that medication was helpful on this point.

- **12.09, Substance Addiction Disorders.** Dr. England observed that the record was unclear. Plaintiff did tell Dr. Hanigan that he had quit drinking as of February 28, 2005; however, Dr. Fix was under the impression that plaintiff was still drinking, at least on weekends, as of March 8, 2005. Dr. England noted compliance issues, which the plaintiff attributed to financial conditions and his mental disorders. During a 20-month period, plaintiff missed about 10 months of treatment (August 2, 2005 through January 23, 2006 and February 23, 2006 to June 30, 2006). (Tr. 355). It appeared to Dr. England that the waxing and waning of plaintiff's symptoms was due to his failure to obtain treatment and take his medications. The record suggested that drinking has not been a major problem since March 2005.

The record was mixed as to the reasons for plaintiff's noncompliance. The medical professionals had repeatedly advised plaintiff that compliance with medications and sessions was important, suggesting that they expected he was capable of compliance. Dr. England noted a medical record dated June 7, 2005 stating that plaintiff was unable to keep his appointments secondary to motivation. Dr. Mosner's report indicated that plaintiff had been working in late 2004, suggesting that he was up and out and productive at some time.[3] There may have been times when

---

[3]Plaintiff testified that he did not remember when he was "remodeling this car," but it was probably in 2001 or 2000. (Tr. 357).

plaintiff's symptoms interfered with his compliance, but his symptoms did not account for the extended periods of time when plaintiff omitted treatment.

Dr. England was not familiar with the requirements entitling individuals to receive General Assistance in Douglas County, but would generally expect those kinds of programs to be available to people with low income or who are unable to work. The record in this case referred to Dr. Hanigan submitting forms, but contained no specific information about plaintiff's applications for General Assistance.

Based on the statements in the record, Dr. England concluded that plaintiff felt that his medications did help considerably. (Tr. 369).

Dr. England also testified that he could separate the issues of alcohol use and compliance to some extent, and stated that weekend drinking of alcohol could affect medications but it would be less of a problem than noncompliance with medication. (Tr. 361-362; 367).

Dr. England opined that it did not appear that the plaintiff's mental impairments either met or equaled any of the listings contained in the listing of impairments. (Tr. 364).

Assuming plaintiff did not use alcohol and was compliant with his medications and treatment, he would suffer zero to slight impairment in the activities of understanding and remembering short, simple instructions; carrying out short, simple instructions ; and making simple work-related decisions. He would be slightly to moderately impaired in the ability to carry out detailed instructions. (Tr. 365). Plaintiff would be slightly to moderately impaired in his ability to interact appropriately with the public and with supervisors; however, there could be periods where he could be markedly limited if there were sharp disagreements with plaintiff and a supervisor.

-20-

Plaintiff would be slightly to moderately impaired in responding appropriately to work pressures and to changes in a routine work setting. (Tr. 366).

Assuming that the plaintiff was noncompliant with his medications and treatment and that plaintiff consumed some alcohol, Dr. England was of the opinion that plaintiff would be slightly to moderately impaired in the ability to understand and remember short, simple instructions; carrying out short, simple instructions ; and making simple work-related decisions. He would be moderately impaired in the ability to carry out detailed instructions. (Tr. 368). Plaintiff would be moderately to markedly impaired in the abilities to interact with the public, supervisors and coworkers and to respond to pressures in the work setting. He would be slightly to moderately impaired in responding to changes in the work setting. (Tr. 368). Noncompliance would cause the biggest impact in plaintiff's social relationships in the workplace, where a combination of temper and anxiety would be quite disruptive. (Tr. 368).

Vocational expert Deborah Determan testified that plaintiff had performed past relevant work in the positions of appliance repair and shipping. (Tr. 377). She testified in response to a hypothetical questions posed by the ALJ that assumed an individual of plaintiff's age, education, and work history (Tr. 378-381). In Ms. Determan's opinion, the individual could perform work at the sedentary exertional level with slight limitations in understanding, remembering, and carrying out short, simple instructions at the unskilled level, and in responding to work pressures and change at the unskilled level (Tr. 378, 380). The individual would be moderately limited in understanding, remembering, and carrying out detailed instructions at the semi-skilled or skilled levels; in interacting appropriately with the public, coworkers, and supervisors; and in responding to work

-21-

pressures and changes at the semiskilled level (Tr. 378, 380).  Responding to a hypothetical posed by plaintiff's representative, Determan testified that if the plaintiff had a markedly limited ability to perform activities within a schedule, maintain regular attendance and be punctual, that work would be precluded.  (Tr. 381-382).  Determan testified that the ALJ's hypothetical questions were consistent with the full range of sedentary work and that plaintiff could perform a significant number of jobs existing in the national economy, including the positions of telephone quote clerk, food and beverage order clerk, and call-out operator (Tr. 380-381).

The ALJ's adverse decision was issued on May 3, 2007. (Tr. 27).  Plaintiff's representative subsequently submitted to the Appeals Council a mental residual functional capacity assessment form completed by plaintiff's psychiatrist, Dr. Hanigan.  The form[4] (filed at Doc. 17) was mailed to Dr. Hanigan on June 27, 2008, was completed by Dr. Hanigan on July 24, 2008, and was faxed to the Appeals Council on July 27, 2008.  Dr. Hanigan reported that plaintiff was markedly limited in his ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods on a sustained basis. Dr. Hanigan also reported that plaintiff was markedly limited in his ability to get along with co-workers and peers. Other moderate limitations were reported. Dr. Hanigan reported that she had never seen plaintiff under the influence of alcohol and felt that even in the absence of alcohol he was likely to be disabled by serious mental symptomology.  Finally, Dr. Hanigan reported that while plaintiff had occasionally been noncompliant with medications and/or

---

[4]This document was not included in the administrative record.

treatment that it was the very nature and severity of mental illness which compromised his ability to use good judgment and have insight regarding compliance.

On August 13, 2008, the Appeals Counsel denied plaintiff's request for review (Tr. 4-7), noting:

> As to your May 2007 decision, the Appeals Council concurs with your representative's allegations that there is an inconsistencies [sic] in the record regarding your exertional limitations. However, contrary to your representative's assertions, the Appeals Council does not find that remand is warranted, because based on the residual functional capacity for sedentary work, the vocational expert identified jobs that you could perform that exist in significant numbers in the national economy. In conjunction with the finding, the decision denied benefits at the 5th step of the sequential evaluation based on a sedentary Medical-Vocational, i.e., Rule 201.28 which directs a finding of not disabled.
>
> The Appeals Council has also considered Dr. Haligan's [sic] medical source statement but accords this opinion little weight. The assessed limitations are not consistent with the evidence before the [ALJ], the form was completed nearly a year after the date of the decision, and Dr. Haligan [sic] does not indicate the period under consideration.

Tr. 5.

## III.  LEGAL ANALYSIS

### A.  Standard of Review

In the May 3, 2007 decision, the ALJ found that the plaintiff was not entitled to disability benefits because he is not "disabled" under sections 216(i), 223(d) or 1614(a)(3)(A) of the Social Security Act. This decision, which stands as the final decision of the Commissioner, must be affirmed if it is supported by substantial evidence in the record as a whole. *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" *Id*. (quoting *Young v. Apfel*,

-23-

221 F.3d 1065, 1068 (8th Cir. 2000)).  The court must consider the entire record, including evidence

that supports as well as detracts from the Commissioner's decision.  The court cannot reverse the

Commissioner's decision simply because some evidence may support the opposite conclusion.  *Id.*

*See also Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008);  *McEvers v. Astrue*, 518 F. Supp. 2d

1071 (S.D. Iowa 2007).

### B.  Errors Alleged

Plaintiff alleges (1) the Appeals Council erred in failing to consider Dr. Hanigan's July 24,

2008 opinion[5]; (2) the ALJ erred in weighing the medical evidence, relying unduly on the opinions

and input of Dr. England; (3) the ALJ's conclusion as to plaintiff's residual functional capacity is not

supported by substantial evidence; (4) the ALJ submitted an inaccurate hypothetical to the vocational

expert; (5) the ALJ'S conclusions with regard to noncompliance and credibility are not supported by

substantial evidence; and (6) the ALJ erred in assessing the materiality of alcohol abuse.

### C.  Discussion

Under the Social Security Act, the term "disability" is defined as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months."  42 U.S.C. § 423(d).  Further,

> (A) An individual shall be determined to be under a disability only if his physical
> or mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work

---

[5]The court summarily rejects this argument.  The Appeals Council had given plaintiff an extension of time until June 29, 2008 to submit additional information, (Tr. 9), and the supplemental information was not timely filed.  The portion of the Appeals Council's decision, quoted above, clearly shows that (and why) the Appeals Council considered and rejected Dr. Hanigan's supplemental information.

-24-

experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

(B)  In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. 423(d)(2)

In deciding whether a claimant is disabled, the ALJ must follow a five-step sequential evaluation process, considering:

1) whether the claimant is presently engaged in a "substantial gainful activity;" 2) whether the claimant has a severe impairment–one that significantly limits the claimant's physical or mental ability to perform basic work activities; 3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations ...; 4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and 5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Medhaug v. Astrue*, — F.3d — , 2009 WL 2602266 at *7, No. 08-2751 (8th Cir., Aug. 26, 2009)

(quoting *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir.1998)).

In this case, the ALJ determined:

-25-

**Step 1:**  Plaintiff met the insured status requirements of the Social Security Act through September 30, 2004 and had not engaged in substantial gainful activity since June 1, 2002, the amended alleged onset date.

**Step 2:**  Plaintiff had the following severe impairments:  Moderate osteoarthritis at L4-5 and L5-S1; early osteoarthritis of the right shoulder, right hand and right hip; major depressive disorder; antisocial personality disorder; and substance use disorder (alcohol).

**Step 3:**  Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The reasons given for this finding were that the plaintiff's musculoskeletal impairments were not associated with non-union of a fracture, burn injury, amputation, or inability to ambulate effectively. The ALJ also found that plaintiff's mental impairments did not cause marked or extreme limitations in at least two of four areas of function.  His mental impairments, including the substance use disorder, caused the following "Part B" limitations[6]:  Mild to moderate restriction of activities of daily living; moderate to marked difficulties in maintaining social functioning; generally moderate, at times marked, difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.

**Step 4:**  Plaintiff had the residual functional capacity to perform a full range of light work, but was unable to perform any past relevant work, based on his marked limitations, on a monthly basis, in the area of interacting with supervisors and co-workers, and his marked limitation in the

---

[6]The functional limitations (found in Paragraph B of listings 12.02-12.04, 12.06-12.08 and 12.10 and paragraph D of 12.05) that exist as a result of the individual's mental disorder(s).

area of responding to the pressures of semi-skilled and skilled work.  Plaintiff was "slightly" limited in the areas of understanding simple instructions and dealing with changes in an unskilled work setting.  He was "moderately" limited in detailed instructions; making work-related judgments; interacting on a brief and superficial basis with the general public; responding to the pressures of unskilled work; and dealing with changes in a semi-skilled or skilled work setting.  Plaintiff was "markedly" limited in responding to pressures in a semi-skilled or skilled work setting.  Plaintiff's ability to interact with supervisors and coworkers was moderately limited for the most part; however, the limitation could rise to the marked level on a monthly basis.

**Step 5:**  Due to the Step 4 findings, the burden shifted to the Commissioner to prove that there are other jobs in the national economy that the plaintiff can perform.  In this regard, the ALJ found that plaintiff was a "younger individual" under the Regulations; he had at least a high school education and is able to communicate in English; and his acquired job skills did not transfer to other occupations within his residual functional capacity.

Based on the vocational expert's testimony, the ALJ concluded that, considering all of the plaintiff's impairments, ***including the substance use disorder***, plaintiff was unable to make a successful vocational adjustment to work that exists in significant numbers in the national economy.

The ALJ, however, also concluded that plaintiff's substance use was a contributing factor material to his disability; therefore,  plaintiff was not entitled to a period of disability or to disability insurance benefits, and plaintiff was not eligible for supplemental security income.

If plaintiff stopped the substance use, his osteoarthritis, major depressive disorder and antisocial personality disorder would impose more than slight limitations on his ability to perform

-27-

basic work-related functions.  However, he would not have an impairment or combination of impairments that meets or medically equals any of the relevant listings and he would have the residual functional capacity to perform sedentary work.  His ability to perform the full range of sedentary work would be slightly or moderately limited in several categories due to nonexertional, mental limitations.

The court finds that the ALJ did not err in his handling of the evidence of drug and alcohol use in this case.  Alcoholism and drug addiction have been eliminated as a basis for obtaining Social Security disability benefits.[7]  In such cases, an ALJ is required to make a disability determination under two separate conditions.  *See generally, e.g., Merritt v. Astrue*, 609 F. Supp. 2d 850, 865 (E.D. Mo. 2009) (citing *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000)).  The first determination is made based on the existence of all of the plaintiff's credible impairments including alcoholism and/or drug addiction.  The second determination is made considering all of the plaintiff's credible impairments except alcoholism and/or drug addiction.  If a plaintiff is considered disabled in the former instance, but not in the latter, alcoholism and drug addiction is a material factor contributing to disability and the individual would be ineligible for disability benefits based on Pub. L. 104-121 and 20 C.F.R. §§ 404.1535(b)(2) & 416.935(b)(2).

The Commissioner's regulations at 20 C.F.R. §§ 404.1535 and 416.935 provide that if the ALJ concludes a claimant is disabled and there is medical evidence of DA&A, the ALJ must

---

[7]Section 105 of Pub. L. No. 104-121, codified at 42 U.S.C. § 423(d)(2)) & 42 U.S.C. § 1382c(a)(3)(J), provides, "[a]n individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

-28-

determine whether the substance addiction is a "contributing material factor to the determination of disability."  The key factor in this determination is whether the ALJ would still find the claimant disabled if he or she stopped using drugs or alcohol.  *Merritt v. Astrue*, 609 F. Supp. 2d at 865.

The ALJ provided a lengthy discussion of the reasons for his finding that the plaintiff would have the residual functional capacity to perform sedentary work if he stopped the substance abuse. Although the plaintiff's medically determinable impairments, without substance use, could reasonably be expected to produce the alleged symptoms, the plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible.  The stated reasons for this finding include:

- No psychiatrist had stated that plaintiff was substantially limited by his lack of social skills.

- Plaintiff had problems related to compliance with medication and treatment and problems with alcohol use.  Dr. Fix's March 8, 2005 report reflected that plaintiff was still using alcohol and Dr. Fix's diagnoses included alcohol dependence.

- The record shows a history of excuses, going in and out of therapy, and losing general assistance benefits because he was "irritated." The ALJ noted a lack of definitive medical evidence about plaintiff's substance use due to the lengthy gaps in the treatment records; plaintiff was not seen from February 2006 until July 2006.  There was a 4-month gap in treatment between February and June 2005, and a 5-month gap from August 2005 to January 2006.  The records included numerous reference to noncompliance with medication and missed appointments, usually due to lack of motivation and, on one occasion, due to confusion over an apparently erroneous bill for $800 from the Douglas County Hospital.  The ALJ stated:  "It defies common sense to conclude that from March 2005, when the claimant saw Dr. Fix, until July 2006, the most recent medical record from Douglas County Hospital, the claimant was drinking only on weekends, as he told Dr. Fix in March 2005."  Although the record did not include direct evidence of alcohol use since the amended alleged onset date, the circumstances did not support a conclusion that the claimant's behavior had changed.  "The record as a whole demonstrates that alcohol use is 'part and parcel' an endemic feature of the claimant's lifestyle."

- Although plaintiff states he cannot afford medication and treatment, he sees a psychiatrist at Douglas County Hospital approximately every two months.

-29-

- The ALJ gave great weight to the reports of Dr. Moessner and Dr. England, but did not give great weight to the report of Dr. Fix to the extent Dr. Fix minimized the impact of alcohol use on the claimant's ability to function. While Dr. Fix relied on the plaintiff's statements, the other medical evidence of record showed that the claimant's behavior and statements were inconsistent with his statements to Dr. Fix.

- Ms. Beckwith's testimony, while generally credible, did not establish that the plaintiff was unable to perform any and all types of substantial gainful activity.

- The ALJ did not give great weight to the plaintiff's implicit allegation that he is unable to engage in full-time, competitive, gainful employment on a sustained basis, with or without alcohol use. "The record as a whole implies that the claimant's lack of motivation and social discomfort would be favorably influenced by his compliance with prescribed medication and treatment and abstinence from alcohol use.

The ALJ found that the plaintiff's substance use disorder was a contributing factor material to the determination of disability. Thus, the plaintiff had not been disabled within the meaning of the Social Security Act from the amended alleged onset date through the date of the May 3, 2007 decision.

An ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate. *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). Both physical and mental limitations must be considered.

> A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In assessing the credibility of a claimant's subjective pain complaints, an ALJ is to consider factors including the claimant's prior work record; the claimant's daily activities; observations of the claimant by third parties and treating and examining physicians; the duration, frequency, and intensity of the claimant's pain; precipitating and aggravating factors; the dosage, effectiveness, and side effects of the claimant's medication; treatment, other than medication, for relief of the claimant's pain; and functional restrictions on the claimant's activities. *See id.* Although "an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical

-30-

evidence to the contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) (internal citation omitted); *see also Goodale v. Halter*, 257 F.3d 771, 774 (8th Cir. 2001) (noting that an ALJ may discount subjective complaints if there are inconsistencies in the evidence as a whole), *cert. denied*, 535 U.S. 908 (2002).

*Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (parallel citation omitted).

A treating physician's opinion is not inherently entitled to controlling weight. *See Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007).

> "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, ***provided*** the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." ... The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight.... "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." ... Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement....

*Hamilton v. Astrue*, 518 F.3d at 610 (emphasis added; citations omitted).

Here, there is no evidence of any treatment for plaintiff's alleged mental or physical impairments from plaintiff's amended alleged disability onset date of June 1, 2002 through August 2004. The records of August 25, 2004 indicate only that plaintiff was in a motor vehicle accident in 1985, at which time he had a hip surgery, and that plaintiff was taking no medication. (Tr. 230-32). At that time plaintiff reported what the examining physician described as "regular alcohol use." After plaintiff began treatment, there were numerous missed appointments and large gaps in treatment sessions and medication compliance. As of the date of the hearing, plaintiff had provided inconsistent information regarding his consumption of alcohol. Although the plaintiff now argues

-31-

that he was unable to afford medications and treatment the records showed no request for samples or referrals to a different clinic.  There is no indication that Dr. Hanigan's office did or would decline to treat plaintiff due to non-payment.  Rather, the clinic nurses stressed compliance and Dr. Hanigan suggested additional treatment, such as counseling, rehabilitation services, and anger management classes.  The plaintiff did not follow these recommendations because he did not like Dr. Gillespie and did not like working with other people at Good Will and at the Community Alliance Program. The record also reflects plaintiff's frequent statements that he had quit drinking and did not believe he had a problem with alcohol, but he subsequently admitted he had not maintained sobriety until March 2006.  All of the doctors agreed that alcohol consumption, at any volume or frequency, would interfere with plaintiff's medications.  While, according to Dr. England, the record suggested that drinking had not been a major problem since March 2005, plaintiff's medical records were hardly conclusive on this point, given that he had missed half of his treatment sessions during the applicable time period.

## IV.  CONCLUSION

This court has reviewed the entire record and finds that the plaintiff was given a fair hearing and full administrative consideration in accordance with applicable statutes and regulations.  For the reasons discussed above, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed.  Accordingly,

**IT IS ORDERED** that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

**DATED September 30, 2009.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-33-